The next case for our argument is Chevron U.S.A. Inc. v. U.S. Environmental Protection Agency. I'll give you a moment to set up. You may approach the podium when you're ready. You may begin. Good morning, Your Honors, and may it please the Court. My name is Kate Stetson. I represent the petitioner Chevron. Chevron was ordered by the federal government to decommission two offshore drilling platforms, Platform Gale and Platform Grace. As part of that process, Chevron approached EPA and asked a straightforward question of statutory interpretation. Under the Clean Air Act, at the point of the decommissioning process where the platforms, Gale and Grace, no longer emit or have the potential to emit pollutants, do the platforms need to carry a Clean Air Act permit? Under the regulations and the statute that govern this question, of course, one of the things that you look at is, does this facility have the potential to emit or is it emitting? So the question that Chevron posed to EPA was, at the point where the platforms don't do that, do they still need a permit? In January of 2021, EPA came back and said no. At that point, Platform Gale and Platform Grace will no longer need a Clean Air Act permit. And Chevron went forward on that representation. But a few months later, EPA came back and changed- Let me stop you there, Counselor. Sure. You said that Chevron went forward based on that representation, setting aside the question of whether Mr. Moore was authorized to really give the definitive final word for the EPA, don't you have to show some reliance interests? And if so, is there anything in the record showing that Chevron relied on the position of the January letter to its detriment? Well, I don't think Chevron needs to show reliance interests in order for the decision of the Deputy Director for Air and Radiation, which was delivered to EPA, for it to be a final agency action. Chevron was in the process of developing its decommissioning plans. Let's assume that it is a final action. I thought part of your argument was that the rescission of that January letter then is a problem in this particular case. And that's where I think the reliance interests have to come in. Before Chevron shows that it relied on it or suffered any detriment from that, can't EPA change its mind at any time? The short answer is EPA is entitled to change its mind, but we are equally entitled to challenge that change of mind. I don't think EPA has ever argued in this case that Chevron needed to show a reliance interest during that three-month period. The question here, the merits question, is when EPA changed its mind in April and said, actually, with respect to the platforms, we're not going to tell you one way or another whether the platforms still need a permit. You, Chevron, need to go to Ventura County, which is the state permitting authority for the Clean Air Act, and ask this interpretive question to them. Why didn't you go to Ventura at first, right? Instead of going directly to EPA and ask, do we still need a permit after we cap? I think the reason, Judge Paez, we didn't go to Ventura County is because of the division of labor between EPA and Ventura. Ventura is responsible under the delegation for implementing and enforcing the Clean Air Act provisions. Who issues the permits? Ventura issues the permits, but the question here is not, can we have a permit? The question is, do we need a permit under the interpretation of the Clean Air Act, and that's EPA. If Ventura issued the permit, why wouldn't you go to Ventura and say, hey, do we still need a permit? Does this permit, can we go ahead and decommission completely? Because, Judge Paez, that question is a question that depends on the interpretation of the Clean Air Act, and that is EPA's exclusive purview. EPA is responsible for interpreting the Clean Air Act. It can't delegate that interpretive power. Oh, I understand that, but the delegation authority seems to suggest that there's going to be some interaction between Ventura and the EPA. That is, that Ventura can go to the EPA and say, hey, tell us what is proper here. I think if what you're positing, Judge Paez, is that Chevron could have gone to Ventura, could have asked the same question. Ventura could have gone to EPA and said, what do you think about this question? EPA would have offered its interpretation to Ventura. Ventura would have gotten back to Chevron. That's certainly another way this could have played out, but because it is EPA's purview only to interpret the Clean Air Act, Chevron went to EPA, as many regulated entities do all the time, and asked for what's called an applicability determination. Do we need a permit in these circumstances? Do you understand the April letter as having rescinded the January letter? In part, yes. They certainly don't say that. They're very muddy in the April letter. What the April letter did was essentially take back a clean answer and replace it with a maybe. In that respect, that's why I said in part, yes. It is a rescission of the January letter. The January letter said, at the point at which these platforms no longer emit, they no longer need a permit. The platforms no longer need a permit. The April letter says, but if there are other activities at the site that might require a permit, we're not going to say one way or another whether the platforms need a permit. Even assuming that the April letter rescinded the January letter because it did a U-turn on whether the decommissioning activities could constitute an OCS source, that doesn't in and of itself mean that the April letter represents final agency action, right? I believe that it does, but there are two different arguments why the April letter represented final agency action. Right, well, in fact, that's why I asked about the reliance interest, because you argued that the U-turn alone demonstrates that the April letter is final agency action. So I think we have to analyze it separately. Looking at the April action alone, isn't there a problem with whether the letter determined the legal rights and obligations? The short answer is no. There's not a problem there, because that's exactly what the April letter did, and it's why, actually, the reliance interests aren't and have never been in play here. The question under the final agency action doctrine is, number one, is this a final word of the relevant decision maker, which is here EPA? Number two, does it create, in a pragmatic sense, in a practical sense, which is what this court looks at when it looks at final agency action, does it create an obligation on the part of Chevron? And the answer with respect to the April letter was absolutely, because after the April letter, Chevron then was required to go to Ventura in order to ask Ventura the question that EPA should have answered and, in fact, did answer in January, which is, with respect to these platforms, do we still need a permit? You may not need a permit. That question remains unanswered. Chevron would have to go through the process first to determine whether the specific activities for these two sites or platforms would require a permit. That's exactly right, Judge Winn, but it's the fact that Chevron would need to go to an entity that it maintains doesn't have a role to play or a thing to say about this particular question that is the obligation that was imposed on Chevron. One case that's helpful in this respect, I think, is the Navajo Nation case from 2016 in this court, because that homes in, Judge Winn, on the question that you're raising, which is when is something a final agency action? What do you look at? What decision do you look at? And there the question was, at the point where DOI had made a determination that certain Navajo remains were subject to a statute that required an inventory, was that a final agency action? And the court majority there said, yes, it was, because the Navajo Nation was saying that statute doesn't apply at all. So the point here, where EPA decided that it was not going to decide the question that Chevron had posed to it, which is, do these platforms need a permit, that it was going to say, maybe, maybe not, and send the question off to a different authority. Why is this more like the preliminary jurisdictional determination in Hawks rather than an approved jurisdictional determination? Because there are still steps that need to be done in this particular case, not unlike the steps that would have to be done in the preliminary jurisdictional determination in the Hawks case. I think the difference here is that the steps that are said to be done in order to assume that there are steps that still need to be completed, you have to buy into EPA's argument, which is, we say there are steps that need to be completed, therefore they are. That's why I mentioned the Navajo Nation case, because our point is not whether Ventura County may or may not issue a permit to Chevron. Our question is, do we need to go and ask for one at all, at the point where these platforms are just concrete and metal, and there is nothing emitting from those platforms? Do we need a permit at all? And that's the EPA's purview. You start out by saying that EPA said no in January, and then perhaps they changed their mind, or they might change their mind, because they wanted more information, and they said go to Ventura and give them more information, and then maybe Ventura will consult with us and we'll resolve it. But that doesn't, to me, look like a final determination has been made, a consummation of the whole process. It looks like there's more to go before the agency really changes its mind. It's like, hey, there's more to this decommissioning than just capping the pipes. There's a lot more that's going on here. To remove the whole structure is quite an undertaking, and we need to consider that before we can really answer your question about whether any kind of permit is needed to complete all the work. So let me offer two responses. The first has to do with the decommissioning itself, and I want to be very clear about something. It could be that we in the government are not very far apart on something, which is our question to EPA was, and this is why I keep emphasizing platforms, at the point where the platforms are no longer emitting, do they need to have a permit? Do the platforms need to have a permit? What EPA said in January was, at the point at which the platforms are no longer emitting, you don't need a permit. What EPA said in April to your question, Judge Paius, was there could be other things at the site that might need a permit. That's not Chevron's question. Chevron's question was, do the platforms need a permit? And if you look at the government's brief, the pages— Why is it significant then that their answer, why don't you just cooperate with them? I mean, if that's the case, I mean, there's a whole lot. It looks like there's quite a bit of a process to decommissioning a platform. There is indeed. But as you can tell from the— It's not an easy thing. No, it's not. How often has that happened in the past? You said this was a novel question. I mean, when's the last time this happened? So with respect to the platforms that are in the Pacific, actually none of them have been fully decommissioned. Most of the platforms, as I understand things, are in the Gulf of Mexico, and some of them have been subject to decommissioning. I am not sure and don't even know whether those platforms in the Gulf are subject to the same kind of state or county requirements as here. I think it depends on the applicability of certain NAQS provisions of the Clean Air Act. But with respect to the Pacific, this hasn't happened before. That's why it's unique. What is the current status of the GRACE and the GAL platforms? They are still in the process of that early stage, the pre-abandonment and abandonment. As I understand this, and this is not in the record, but my understanding is that the wells that were servicing the platforms have been plugged and abandoned and that they are continuing to take steps to remove the equipment and the material from the platforms themselves. But, Judge Paez, to your second question with respect to this process, I think that where the rubber hits the road with respect to where the government and we disagree is the government's April letter appears to suggest that after the platforms have been fully decommissioned, meaning just metal and concrete and you move on to those subsequent phases of decommissioning where you're taking them apart, restoring the seafloor, all of that, but after the platforms are just concrete and metal, what the government's April letter seems to say is they still may need a permit. We're not going to tell you. You need to go and ask Ventura County. But our point is, with respect to that sole statutory interpretation question, that's EPA's job and EPA answered it wrong. I thought the way, and this is way beyond me because the regs are difficult to follow from somebody who doesn't practice this law, who's not deeply, steeply involved in these regulations, but I thought what the government was saying in their brief at least was that like the barges that might have to tie up to the platform or somehow connect to the platform in order to remove essential parts, that the platform might well emit pollutants and therefore those pollutants should be attributed to the platform. Yes. And therefore you still need a permit to maintain the platform. That's what I thought they were saying. They appear to be saying a couple different things. So if you look at pages 40 to 41 of their brief, actually the government appears to agree with us that at the point where the platforms are no longer emitting, the platforms don't need a permit. And if Mr. Dupre gets up here and says we agree with that, then we have no further quarrel. But what they say at page 23 of their brief is there may still be things for which the platforms require a permit. So there's a little bit of confusing double talk here. With respect to your question, Judge Paez, about the barges. I just use that as an example. Yes, yes. But it's an important example, right, because this is what the government spends a lot of its time on in its brief, the barges, the derrick barges and the vessels and so forth. There is an important distinction in the regulations when it comes to when a vessel is or is not an OCS source. And I want to dwell on this for just one minute because it's an important answer to your question. When a vessel is attached to an OCS facility, it can be an OCS source, but that requires the OCS facility to be an OCS source. You can't just marry a barge up against a dumb platform that's just metal and concrete and render the platform still an OCS source. The barge itself, if it connects to the seafloor, if it attaches to the seafloor, the barge becomes the OCS source. And that's why I'm making that distinction between what we're asking for here, which is a read from EPA about whether the platforms need permits versus what the other things are that play into decommissioning. And I want to be very clear, this is not the Wild West. When it comes to decommissioning, there is a raft of regulations that apply, including to the vessels that are at issue here, the derrick barges, the cargo barges, all of the vessels that have to come and help decommission the site. There are dozens, if not hundreds, of regulations that apply to decommissioning. There's an entire NEPA process that is devoted to decommissioning. The question here is just one of turf. Who gets to decide whether platforms Grace and Gale need a permit at the point where they are no longer in need? I understood the April letter to be saying that, well, now that we've taken another look at this, there's a lot more information that we really need to make a final decision. And we think the best way we ought to get to that point is for you to bring all this stuff to the attention of Ventura, and we can deal with Ventura. It didn't seem to me like there was a real final consummation of the decision-making process. And I'm glad that you returned to that, Judge Pius, because that was a point of one of your earlier questions that I wanted to make sure that I hit. The question is, was this the consummation of EPA's decisional process? And the answer is yes. With respect to EPA, EPA has essentially washed its hands of this question. The fact that there is further process left to happen, which is often the case, you can look at the herring fisherman case that we cite, the fact that there's further process doesn't mean that this is somehow not final agency action. The EPA's action is final, and it imposed, as a practical matter, obligations on us to go to Ventura County. So it's final. It's also an erroneous statutory interpretation. I'm sensitive to my time. I want to be sure to leave time to refer a bottle if there are no further questions. Thank you. Thank you, Your Honor. May it please the Court, Philip Dupre with the Department of Justice on behalf of EPA. With me at Council table is Aaron Messing from Region 9 of EPA. One of the things I want to start out with is Ms. Stetson stated that Ventura County doesn't have a role to play here. But the role Ventura County has been put in was first off from the statute itself, which directed EPA to work with states and to delegate authority to them. And secondly, to the extent Ventura County is involved, it's based on a 1994 delegation agreement. And so contrary to that position, Ventura County does have a role to play. And it's important to look at what EPA did here in the context of that delegation agreement. And EPA, excuse me, Ventura County has been overseeing these platforms for over 25 years. There are express provisions in the delegation agreement for which interpretive questions can be raised. And it is under that backdrop that EPA's April letter needs to be understood. And primarily, EPA hasn't consummated its decision-making process because that decision-making process is informed by the delegation agreement and the interaction between Ventura County and EPA. So when Chevron came to EPA and said, can you confirm that at the end of the decommissioning process, a permit, an OCS permit, is no longer needed, EPA answered that question in April with, we think more detailed facts are important to answer that question. But they got an answer in January. Well, they... As I understood from the briefing and sort of the exchanges in the record, that Ventura County doesn't have final authority on interpreting the statutes or the regs, and there's nothing to preclude Chevron from going directly to EPA and say, hey, what about this? Absolutely, there's nothing wrong with EPA, excuse me, with Chevron reaching out to EPA. And that's what they did in, what was it, December? Yes, well, I think it was a little earlier in 2020, maybe September. But EPA sent an answer back in January. EPA sent an answer back. You know, you don't need a permit. Absolutely, and EPA changed the answer. EPA said, you know, after reviewing this more, after considering factors including... Why isn't that a final consummation? You said, no, we thought this, and now you probably need a permit, or you might need a permit, or you need a permit. Can I rephrase it? Maybe, I don't know if this will help, but how does the April letter determine Chevron's rights and obligations? Largely, it doesn't, because the rights and obligations of Chevron are set forth by the regulations and the statute. And so the question of, when do I no longer need a permit? What EPA said in both January and April were not substantive rulemakings in terms of that process. All it was was, in April, EPA explaining that they needed more facts to apply the law to in order to better answer Chevron's question. So what was that January letter? Just an advisory letter? Well, I think there are... You don't need a permit under these facts? Well, the January letter, I think, to some extent speaks for itself, but I think it's important to put it into context of the regulatory regime we have here. Unlike in Hawks and the jurisdictional determinations, or many of the cases cited, there are either separate regulations and rules or guidance that explains exactly what a permit applicability determination is going to look like and what it means. There's literally none of that here. We just have the January letter itself and then the April letter. And so in terms of what the January letter itself meant, I think we argue that it didn't change any rights and responsibilities that Chevron had under the statute and the regulations. But more importantly, it's the April letter that's being challenged here, and it's clear that the April letter is not a consummation of the agency's decision making. Let me ask you this. Is there something under the permit that says that either EPA or Ventura has to go out and look to see that the wells have been capped properly? Well, there's a couple different things that are important to note. There are different regulatory regimes here, and the Bureau of Ocean and Engineering Management and other agencies within the Department of Interior have a lot of regulatory authority over how decommissioning takes place. What we're talking about here are air emissions and specifically air emissions from stationary sources. And so the only way those air emissions in the decommissioning process are regulated is through the Clean Air Act and through these provisions at issue. And so certainly it could be appropriate, as with any permitting agency or permittee, for the permitting agency to want to go out and take a look to glean more information. The question of do I need a permit or do I no longer need a permit is a classic example of a mixed question of fact and law. There obviously needs to be fact finding to apply the law, and that's part of the reason why there is a local agency, Ventura County, that does it rather than EPA's headquarters. Let me ask you this. I want to make sure that I understand your position, because as I understand the record, Chevron had gone to EPA in January asking for a definitive answer on whether the permitting scheme even applied at all. So once everything is capped off, I don't know if that's the right terminology, but it's no longer capable of emitting pollutants, they don't have to comply with the permitting requirements. They don't have to go to Ventura, check with anybody else. They're not considered OCS sources. They're done. And EPA gave them an answer, assuming that Carmel can speak to the EPA, says, okay, that's EPA's view. We agree with you. You don't have to go through the permitting process at all. In April, the answer is completely different. It's, well, you may still engage. It's a different interpretive question on the scope of the statute, that there may be activities that may require a permit, so go through the process first, right? That's how I understand it. It's a U-turn on that key question as to whether the permitting scheme applied at all. You know, I think we would characterize it as not quite a U-turn, but maybe a partial turn. The key aspects of the law, I think, went largely unchanged between the January and April letter. What EPA was concerned about, and it comes through in the April letter, is whether or not we had enough facts to know how that law would apply. And so what Chevron submitted was really lacking in any sort of detail. In the letter they submitted itself, they said, we're still in the process of developing our decommissioning plans, right? They hadn't been finished. And they just put out there a very direct question about, under these circumstances, would a permit no longer be needed? And EPA in April, without sort of rejecting the legal analysis in the January letter, said, we just need more context to answer it because this additional information can be relevant to answering that question. So in the consultation process with Ventura County, I want to make sure that this is your argument, that in that consultation process, EPA may actually take a position the permitting process doesn't apply? And that's why it's not a final consummation of the decision-making process? The short answer is yes. I want to sort of just characterize a little bit of what we mean by the permitting process, is that at some point, the platforms will no longer be considered an OCS source and thus simply aren't subject to the Clean Air Act and aren't subject to regulation. And the question is, at what point in that process is that going to happen? And what we envision, and this is what's called out in the delegation agreement and in the statute, is we would imagine that Chevron is going to talk to Ventura County, who issued the permits, oversees the permits, is the entity that's been involved for over 25 years, and if and when Chevron and Ventura County disagree about how these permits apply or how long Chevron's facilities are subject to the Clean Air Act and require OCS permits, that according to the delegation agreement, they'd reach out to discuss with the EPA questions of interpretive issues. And then at some point, an answer would be given to Chevron's question of, you know, when do we no longer need a permit? But that question hasn't been answered here, and I think this goes a little bit to our ripeness argument that there's really no need for the court to wait in now answering essentially a hypothetical question by Chevron as to when a permit is no longer needed and instead wait for this to be concrete. The January letter was just all a theoretical exercise? You know, it's tough for me to characterize the January letter in the sense that it speaks for itself, and I wouldn't call it a hypothetical exercise, but I do think the question being asked or question being answered was more abstract than EPA thought was appropriate in the April letter. I guess from my perspective, it might be that we did issue the January letter. It says what it says, but on further thinking about what we said, probably should have had more information, and we now need to rethink the process. And that is EPA's position, and that's why, you know, we said what we said in January, but I think not knowing the details is important or needing to know the details is important to making that final decision. And I'd be happy to go into examples about all of what we don't know about both Chevron's decommissioning process and the decommissioning process in general. You know, as was pointed out earlier, you know, all of these platforms in the Pacific are basically nearing the end of their life cycle. That's why the Bureau of Ocean Energy Management put out the report, which is almost the only thing on the administrative record here that talked about the emissions that are likely to come from various phases of the decommissioning process. You know, EPA has never addressed these questions before, and rather than giving the, or rather than continuing to stand by the very blanket and broad answer in the January letter, EPA made clear that it thought a more detailed evaluation of the activities and the facts would be appropriate. I do want to just make note of one issue, and that is Chevron focuses a lot on the platforms themselves, and I think it's worth understanding that an OCS source could accompany more than just the platforms. If a vessel is attached to the platforms and is in fact emitting pollution from its stationary activities, it may well be that that vessel in its stationary capacity is part of the same OCS source as the platforms itself. Now, of course, whether that's the case in any particular circumstance is going to be fact-specific, but I do think it's important to note that part of EPA's concern, and as borne out by the statute and the regulations, that there are ways in which it is not just the platform that is the relevant OCS source at issue, but it could be broader than the platform depending on how vessels are attached to them and used in a stationary capacity. Why wouldn't you just look at the vessel? Well, so let me give you an example. Let's suppose you have a generator on the platform that breaks. They ship in a new generator. That generator is on a vessel. The vessel docks on the platform it attaches. Rather than move that generator to the platform, they run a power line to the platform. They run the generator on the vessel, which is stationary and attached to the platform. In that circumstance, probably, and again, we don't have any specific questions on that, but probably the argument EPA's view would be the OCS source is one source. It's the platform and the vessel with the generator attached to it. There are two OCS sources, and the vessel needs to get its own independent OCS permit, even though it's attached to the platform and running a power line to the platform itself. In the contrary scenario, or the opposite scenario, there'd be no question that if that generator was removed from the vessel, the new generator to replace the old one is removed from that vessel, swapped out, that the emissions from that generator would be part of the platform and part of that OCS source. All we're saying here is that the details may make a difference in how the statute and the regulations apply. So I think, again, I think there are three key reasons why this matter should be dismissed or denied. As members of this court have noted, EPA has not consummated its decision-making process as to when in the decommissioning process Chevron will no longer need a permit. Moreover, it may well be the case that once Chevron finalizes its decommissioning plan, Ventura County, in consultation with EPA, may conclude and agree with Chevron that it may surrender its permits or will no longer need a permit at the point at which Chevron's platforms no longer emit. And lastly, I'd just like to note that EPA's letter and discussion of the statute should be looked at in the context of answering the questions Chevron's posed rather than indicating some sort of effort by EPA to broadly interpret the statute writ large, that its April letter needs to be viewed in context of answering Chevron's questions. And if there's no further questions, I'd be happy to forego the rest of my time. Thank you. Thank you. Thank you, Your Honors. A couple quick points. The first two are places where Mr. Dupre and I agree. One of them is that what we are talking about here is the regulation of stationary sources. EPA does not have authority over mobile vessels. And I'll get back to vessels in a moment. The second point on which Mr. Dupre and I agree is that the question here is, is there some point at which the platform is no longer an OCS source? At what point is that going to happen? That is exactly the way Mr. Dupre phrased it. That's the question that we posed to EPA that we got the answer we did in January, which is, at the point at which the platforms no longer can emit, are they any longer an OCS-emitting source? And the answer, given in January, you're right, Judge Wynn, was no. At the point where they no longer emit, they're no longer a source. The only way EPA can claim that it hasn't consummated its decision-making process is by changing the question. Because now you notice Mr. Dupre talking about all of the other detail that's required to answer that question, but the example he gave is so critically important here. Because the example he gave, Judge Paez, to your question, had to do with a vessel. A vessel that attaches to an OCS facility is itself an OCS source. It does not make a dumb platform that's just metal and concrete into an OCS source. So now we understand, I think, the government's position, which is, if that barge shows up and attaches to an OCS facility, the OCS facility somehow again becomes an OCS source. And if that's their interpretation of the merits of the Clean Air Act statute, then we are certainly correct that that interpretation is not supported by the statute nor by the regulations. This was a final action because EPA changed the question. EPA sent us to an authority that has no authority to interpret the issue, and EPA's interpretation was wrong. If there are no further questions. Thank you very much. Thank you, Your Honor. Ms. Detson, Mr. Dupre, thank you very much for your oral argument presentations. The case of Chevron v. U.S. Environmental Protection Agency is now submitted. That is the final argument for today. We are adjourned. Thank you very much. Really appreciate both of you coming from Washington, D.C., to make this argument. Thank you so much. Thank you for the arguments. Very helpful.
judges: MURGUIA, PAEZ, NGUYEN